# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| BRIAN BEECH, TERENCE CHIRAMEL, CARL CURRY, BENJAMIN GRAY, MARC IRWIN, BRADLEY JACOBS, JOHN KOOREMAN, CHELSEY LOGAN, DYLAN LOTZ, TYSON LOTZ, JOSEPH MATHEIS, BROOKE MATHEIS, MITHUNKUMAR MEVADA, PAYNE SERVICE CENTER, ALAN NOWICKI, OMAR PADILLA, MARGARET RUH, MARY SHEA, DARYL SILBERMAN, DANIEL SEIDENBERG, FRED SKEPPSTROM, BRADLEY SKIDMORE, REUVEN SOLOMON, DAVID THOMAS, PETER TRAUSCHT, LINDA WOOD, TIMOTHY TREMAINE, JOHN WOZNIAK, AND SANTINA WOZNIAK, | § § § § § § § § § § § § § § § § § § | CASE NO. **JURY TRIAL DEMANDED** |
| Plaintiffs, | § § § | |
| v. | § § | |
| GENERAL MOTORS, LLC, | § § | |
| Defendant | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiffs Brian Beech, Terence Chiramel, Carl Curry, Benjamin Gray, Marc Irwin, Bradley Jacobs, John Kooreman, Chelsey Logan, Dylan Lotz, Tyson Lotz, Joseph Matheis, Brooke Matheis, Mithunkumar Mevada, Payne Service Center, Alan Nowicki, Omar Padilla, Margaret Ruh, Mary Shea, Daryl Silberman, Daniel Seidenberg, Fred Skeppstrom, Bradley Skidmore, Reuven Solomon, David Thomas, Peter Trauscht, Linda Wood, Timothy Tremaine, John Wozniak, and Santina Wozniak ("Plaintiffs") file Plaintiffs' Original Complaint complaining of General Motors, LLC ("GM" or "Defendant") and respectfully show the Court as follows:

1

## PARTIES

### Plaintiffs

1.       Plaintiff Brian Beech is a citizen of the State of Illinois who acquired a 2017 Chevrolet Bolt bearing VIN 1G1FW6S07H4184861 and a 2017 Chevrolet Bolt bearing VIN 1G1FW6S07H4137684 in the State of Illinois. At the time of the acquisitions, Plaintiff was unaware that the vehicles and their batteries were defective.  Had Plaintiff known the true facts about the vehicles, Plaintiff would not have acquired the vehicles or would have paid substantially less for them.  Because Plaintiff was unaware of the defective nature of the vehicles and their defective batteries, Plaintiff suffered overpayment damages at the time of the acquisitions and suffered incidental, consequential and actual damages after the vehicles' acquisitions.

2.       Plaintiff Terence Chiramel is a citizen of the State of Illinois who acquired a 2020 Chevrolet Bolt bearing VIN 1G1FZ6S08L4114625 in the State of Illinois. At the time of the acquisition, Plaintiff was unaware that the vehicle and its battery were defective.  Had Plaintiff known the true facts about the vehicle, Plaintiff would not have acquired the vehicle or would have paid substantially less for it.  Because Plaintiff was unaware of the defective nature of the vehicle and its defective battery, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

3.       Plaintiff Carl Curry is a citizen of the State of Illinois who acquired a 2020 Chevrolet Bolt bearing VIN 1G1FY6S05L4112754 in the State of Illinois. At the time of the acquisition, Plaintiff was unaware that the vehicle and its battery were defective.  Had Plaintiff known the true facts about the vehicle, Plaintiff would not have acquired the vehicle or would have paid substantially less for it.  Because Plaintiff was unaware of the defective nature of the vehicle

and its defective battery, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

4.     Plaintiff Benjamin Gray is a citizen of the State of Illinois who acquired a 2019 Chevrolet Bolt bearing VIN 1G1FZ6S0XK4101051 in the State of Illinois. At the time of the acquisition, Plaintiff was unaware that the vehicle and its battery were defective.  Had Plaintiff known the true facts about the vehicle, Plaintiff would not have acquired the vehicle or would have paid substantially less for it.  Because Plaintiff was unaware of the defective nature of the vehicle and its defective battery, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

5.     Plaintiff Marc Irwin is a citizen of the State of Illinois who acquired a 2017 Chevrolet Bolt bearing VIN 1G1FX6S07H4185277 in the State of Illinois. At the time of the acquisition, Plaintiff was unaware that the vehicle and its battery were defective.  Had Plaintiff known the true facts about the vehicle, Plaintiff would not have acquired the vehicle or would have paid substantially less for it.  Because Plaintiff was unaware of the defective nature of the vehicle and its defective battery, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

6.     Plaintiff Bradley Jacobs is a citizen of the State of Illinois who acquired a 2018 Chevrolet Bolt bearing VIN 1G1FX6S01J4117448 in the State of Illinois. At the time of the acquisition, Plaintiff was unaware that the vehicle and its battery were defective.  Had Plaintiff known the true facts about the vehicle, Plaintiff would not have acquired the vehicle or would have paid substantially less for it.  Because Plaintiff was unaware of the defective nature of the vehicle and its defective battery, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

7.     Plaintiff John Kooreman is a citizen of the State of Illinois who acquired a 2021 Chevrolet Bolt bearing VIN 1G1FY6S05M4102694 in the State of Illinois. At the time of the acquisition, Plaintiff was unaware that the vehicle and its battery were defective.  Had Plaintiff known the true facts about the vehicle, Plaintiff would not have acquired the vehicle or would have paid substantially less for it.  Because Plaintiff was unaware of the defective nature of the vehicle and its defective battery, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

8.     Plaintiff Chelsey Logan is a citizen of the State of Missouri who acquired a 2020 Chevrolet Bolt bearing VIN 1G1FW6S02L4121353 in the State of Illinois. At the time of the acquisition, Plaintiff was unaware that the vehicle and its battery were defective.  Had Plaintiff known the true facts about the vehicle, Plaintiff would not have acquired the vehicle or would have paid substantially less for it.  Because Plaintiff was unaware of the defective nature of the vehicle and its defective battery, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

9.     Plaintiffs Dylan Lotz and Tyson Lotz are citizens of the State of Missouri who acquired a 2017 Chevrolet Bolt bearing VIN 1G1FW6S00H4191229 in the State of Illinois. At the time of the acquisition, Plaintiffs were unaware that the vehicle and its battery were defective.  Had Plaintiffs known the true facts about the vehicle, Plaintiffs would not have acquired the vehicle or would have paid substantially less for it.  Because Plaintiffs were unaware of the defective nature of the vehicle and its defective battery, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

10.     Plaintiffs Joseph Matheis and Brooke Matheis are citizens of the State of Illinois who acquired a 2022 Chevrolet Bolt bearing VIN 1G1FY6S08N4103257 in the State of Illinois. At the time of the acquisition, Plaintiffs were unaware that the vehicle and its battery were defective. Had Plaintiffs known the true facts about the vehicle, Plaintiffs would not have acquired the vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defective nature of the vehicle and its defective battery, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

11.     Plaintiff Mithunkumar Mevada is a citizen of the State of Illinois and Plaintiff Payne Service Center is an Illinois corporation with its prinicapl place of business in Mount Vernon, Illinois. They acquired a 2022 Chevrolet Bolt bearing VIN 1G1FZ6S08N4131640 in the State of Illinois. At the time of the acquisition, Plaintiffs were unaware that the vehicle and its battery were defective. Had Plaintiffs known the true facts about the vehicle, Plaintiffs would not have acquired the vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defective nature of the vehicle and its defective battery, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

12.     Plaintiff Alan Nowicki is a citizen of the State of Illinois who acquired a 2020 Chevrolet Bolt bearing VIN 1G1FY6S03L4149611 in the State of Illinois. At the time of the acquisition, Plaintiff was unaware that the vehicle and its battery were defective. Had Plaintiff known the true facts about the vehicle, Plaintiff would not have acquired the vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defective nature of the vehicle

and its defective battery, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

13.     Plaintiff Omar Padilla is a citizen of the State of Illinois who acquired a 2022 Chevrolet Bolt bearing VIN 1G1FY6S0XN4132033 in the State of Illinois. At the time of the acquisition, Plaintiff was unaware that the vehicle and its battery were defective. Had Plaintiff known the true facts about the vehicle, Plaintiff would not have acquired the vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defective nature of the vehicle and its defective battery, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

14.     Plaintiff Margaret Ruh is a citizen of the State of Illinois who acquired a 2022 Chevrolet Bolt bearing VIN 1G1FZ6S00N4130370 in the State of Illinois. At the time of the acquisition, Plaintiff was unaware that the vehicle and its battery were defective. Had Plaintiff known the true facts about the vehicle, Plaintiff would not have acquired the vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defective nature of the vehicle and its defective battery, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

15.     Plaintiff Mary Shea is a citizen of the State of Ohio who acquired a 2017 Chevrolet Bolt bearing VIN 1G1FX6S08H4159237 in the State of Illinois. At the time of the acquisition, Plaintiff was unaware that the vehicle and its battery were defective. Had Plaintiff known the true facts about the vehicle, Plaintiff would not have acquired the vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defective nature of the vehicle and its defective battery, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

16.     Plaintiffs Daryl Silberman and Daniel Seidenberg are citizens of the State of Illinois who acquired a 2020 Chevrolet Bolt bearing VIN 1G1FY6S09L4141948 in the State of Illinois. At the time of the acquisition, Plaintiffs were unaware that the vehicle and its battery were defective. Had Plaintiffs known the true facts about the vehicle, Plaintiffs would not have acquired the vehicle or would have paid substantially less for it. Because Plaintiffs were unaware of the defective nature of the vehicle and its defective battery, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

17.     Plaintiff Fred Skeppstrom is a citizen of the State of Illinois who acquired a 2022 Chevrolet Bolt bearing VIN 1G1FZ6S02N4105857 in the State of Illinois. At the time of the acquisition, Plaintiff was unaware that the vehicle and its battery were defective. Had Plaintiff known the true facts about the vehicle, Plaintiff would not have acquired the vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defective nature of the vehicle and its defective battery, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

18.     Plaintiff Bradley Skidmore is a citizen of the State of Illinois who acquired a 2019 Chevrolet Bolt bearing VIN 1G1FZ6S08K4110332 in the State of Illinois. At the time of the acquisition, Plaintiff was unaware that the vehicle and its battery were defective. Had Plaintiff known the true facts about the vehicle, Plaintiff would not have acquired the vehicle or would have paid substantially less for it. Because Plaintiff was unaware of the defective nature of the vehicle and its defective battery, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

19.     Plaintiff Reuven Solomon is a citizen of the State of Illinois who acquired a 2020 Chevrolet Bolt bearing VIN 1G1FY6S09L4126253 in the State of Illinois. At the time of the acquisition, Plaintiff was unaware that the vehicle and its battery were defective.  Had Plaintiff known the true facts about the vehicle, Plaintiff would not have acquired the vehicle or would have paid substantially less for it.  Because Plaintiff was unaware of the defective nature of the vehicle and its defective battery, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

20.     Plaintiff David Thomas is a citizen of the State of Illinois who acquired a 2020 Chevrolet Bolt bearing VIN 1G1FY6S07L4106941 in the State of Illinois. At the time of the acquisition, Plaintiff was unaware that the vehicle and its battery were defective.  Had Plaintiff known the true facts about the vehicle, Plaintiff would not have acquired the vehicle or would have paid substantially less for it.  Because Plaintiff was unaware of the defective nature of the vehicle and its defective battery, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

21.     Plaintiffs Peter Trauscht and Linda Wood are citizens of the State of Illinois who acquired a 2020 Chevrolet Bolt bearing VIN 1G1FY6S02L4121430 in the State of Illinois. At the time of the acquisition, Plaintiffs were unaware that the vehicle and its battery were defective.  Had Plaintiffs known the true facts about the vehicle, Plaintiffs would not have acquired the vehicle or would have paid substantially less for it.  Because Plaintiffs were unaware of the defective nature of the vehicle and its defective battery, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

22.     Plaintiff Timothy Tremaine is a citizen of the State of Illinois who acquired a 2022 Chevrolet Bolt bearing VIN 1G1FX6S0XN4101402 in the State of Illinois. At the time of the acquisition, Plaintiff was unaware that the vehicle and its battery were defective.  Had Plaintiff known the true facts about the vehicle, Plaintiff would not have acquired the vehicle or would have paid substantially less for it.  Because Plaintiff was unaware of the defective nature of the vehicle and its defective battery, Plaintiff suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

23.     Plaintiffs John Wozniak and Santina Wozniak are citizens of the State of Illinois who acquired a 2017 Chevrolet Bolt bearing VIN 1G1FW6S0XH4178715 in the State of Illinois. At the time of the acquisition, Plaintiffs were unaware that the vehicle and its battery were defective.  Had Plaintiffs known the true facts about the vehicle, Plaintiffs would not have acquired the vehicle or would have paid substantially less for it.  Because Plaintiffs were unaware of the defective nature of the vehicle and its defective battery, Plaintiffs suffered overpayment damages at the time of the acquisition and suffered incidental, consequential and actual damages after the vehicle's acquisition.

### Defendant

24.     Defendant General Motors LLC ("GM") is a Delaware Limited Liability Company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan 48265.

### VENUE AND JURISDICTION

25.     The Court has diversity jurisdiction because Plaintiffs and Defendant are citizens of different states and the amount in controversy exceeds $75,000 for each Plaintiff exclusive of interest and costs.  GM is a corporation organized, doing business, and existing under the laws of Delaware with its principal place of business in Michigan.

26. This Court also has original jurisdiction to hear this case by virtue of 15 U.S.C. § 2310(d)(1)(A), the Magnuson-Moss Warranty Act, conferred under 28 U.S.C. § 1131. The amount in controversy exceeds $50,000 (exclusive of interest and costs) computed on the basis of all claims to be determined in this suit. The amount of any individual claim of any individual plaintiff is not less than the sum or value of $25.00. The Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

27. This Court has personal jurisdiction over GM because a substantial part of the events, omissions, or misrepresentations giving rise to these claims occurred in and emanated from this District.

28. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events, transactions, and conduct giving rise to the claims occurred in and emanated from this District.

## FACTS

29. GM markets and sells the Chevrolet Bolt, a front-motor, five-door, all-electric, plug-in hatchback. This action arises out of GM's failure to disclose and then adequately repair a uniform and widespread defect in the 60 kWh 350 V lithium-ion battery (hereinafter the "Defective Battery") in the Chevrolet Bolt that has led to numerous safety recalls and guidance from GM that imposes highly restrictive limitations on consumers' use of the vehicles. The defect causes the high voltage battery to overheat when charged to full or nearly full capacity, which can result in catastrophic and destructive fires, resulting in an unreasonable safety risk to the drivers and passengers of vehicles equipped with the Defective Battery. These vehicles (hereinafter "Defective Vehicles" or "Vehicles") are the 2017–22 model year Chevrolet Bolt EVs and 2002 Chevrolet Bolt EUVs (hereinafter "Chevy Bolt" or "Bolt").

10

**A.    Development and Production of the Defective Vehicles.**

30.    GM introduced the Chevy Bolt EV concept in the 2015 Detroit Auto Show and presented it as "a vision for an affordable, long-range all-electric vehicle designed to offer more than 200 miles of range starting around $30,000."

31.    On January 6, 2016, General Motors Chair and CEO Mary Barra formally unveiled the 2017 Chevy Bolt and touted the Vehicle's 200-plus mile range and comparatively low charging time required to reach 80 percent capacity, noting that "the Bolt EV can actually give you time back." Highlighting their EV experience derived from the similarly named Chevy Volt, GM partnered with Korean supplier LG Corporation and its Korean and American subsidiaries to develop and manufacture "an all-new cell and battery pack to offer more than an estimated 200 miles of range."

32.    The Bolt was GM's version of an all-electric vehicle, competing with emerging all-electric vehicle lines promoted by new market entrants like Tesla, Nissan, and BMW. It quickly garnered a number of accolades, including the 2017 Motor Trend Car of the Year, North American Car of the Year, 2017 Green Car of the Year, and Automobile Magazine 2017 All Star awards. These awards touted the Bolt's range and cost—"the $30,000 . . . Bolt EV cut[] by more than half what an electric car with 238 miles range would have cost [in 2015]." Green Car Reports stated that the "most important thing about the Bolt EV" was "how far you can go on a single charge," noting that the 2017 Bolt offered "the range of a Tesla, for roughly half the price." The Bolt was lauded as "the 200-mile-range EV with cool connectivity that people can actually afford."

33.    Range is a key consideration for purchasers and lessees of electric vehicles. It takes substantially longer to charge an electric vehicle than it does to fill up a tank of gas, and a fully charged electric vehicle cannot travel as far on a single charge as most gas-powered vehicles can

travel on a full tank of gas. The impressive range of the Bolt was advertised as being the result of an "unprecedented" partnership between Defendant GM and LG.

**B.**   **Defendants' Marketing to Defective Vehicle Owners and Lessees Emphasized the Battery Power and Range of the Chevy Bolt.**

34.   Range is critical to the success of an all-electric vehicle. Car and Driver Magazine describes range as "the all-important stat"—because electric vehicles "can't be driven as far on a single charge as most gas-powered cars can go on a tank of fuel" and because electric vehicle batteries "can't be rejuiced in the five minutes it takes to top up a car's tank at a gas station." Because battery charging takes more time than refilling a gasoline tank, an all-electric vehicle's usefulness is directly related to the distance the automobile can travel before needing a recharge. Therefore, electric car buyers particularly rely on manufacturer representations regarding how far the automobile can travel on a single charge.

35.   Electric vehicles like the Bolt have important environmental and financial advantages over conventional vehicles with internal combustion engines. Significantly, all-electric vehicles do not produce any of the tailpipe emissions—such as nitrogen oxides and other smog-forming pollutants, other pollutants harmful to human health, and greenhouse gases such as carbon dioxide and methane—that are produced by vehicles with internal combustion engines. The lack of tailpipe emissions means that electric vehicles theoretically help improve air quality, improve public health, and reduce the overall ecological damage caused by driving personal vehicles. This benefit is especially significant in states where most electricity is generated from sources other than coal-fired plants. In addition to the environmental benefits, in general, the cost of electricity to charge an electric vehicle is considerably less than the cost of fueling with gasoline or diesel.

36.     Range and charging ability are two primary considerations of consumers that decide to purchase an electric vehicle. The 2017, 2018, and 2019 Bolt EV Owner's Manuals state that charging the Battery from a standard 120-volt AC electrical outlet for an hour would yield about 4–6 miles of driving range. If the Battery were completely depleted, it would take more than 50 hours to fully recharge at that rate. For this reason, many Bolt owners and lessees install "Level Two" 240-volt charging stations at their residences. Although faster, 240-volt chargers still provide only about 25 miles of driving range per hour of charging and take nearly 10 hours to fully charge from fully depleted. Necessarily, then, the distance one can drive on a fully-charged battery without stopping to recharge the battery (the "battery range" or "range") is one of the most critical factors to consider in purchasing any all-electric vehicle.

37.     GM was aware of this consideration when marketing the Chevy Bolt. At the time of its release, the Chevy Bolt was marketed as having a travel range of 238 miles without recharging. Defendants have consistently made that same representation to consumers since they started marketing the Bolt to the general public. GM went to great lengths in its attempt to demonstrate a 238-mile range, including taking a Car and Driver writer on a test drive "from Monterey to Santa Barbara, California, that spanned approximately 240 miles on coastal highways."

38.     This marketing was particularly important for GM because around the same time as the release of the Bolt, Tesla released a comparable compact electric vehicle—the Tesla Model 3. Both vehicles advertised a range of over 200 miles on a single charge, making them some of the "first [electric vehicles] that could conceivably function as a family's lone car." The Model 3, however, advertised a significantly faster charging time than the Bolt—the Bolt's fastest charging

option, the direct-current fast-charging capability, does not come standard with the Bolt and costs consumers an extra $750, and the Bolt takes about twice as long to fast-charge as the Model 3.

39.     The Bolt's slower charging time, combined with limited access to charging stations, meant that consumers would not be able to make longer trips with the Bolt without significant planning. The inconvenience of charging combined with the slower charging time of the Bolt when compared to its direct competitors made every additional mile of the Bolt's range critically important to consumers.

40.     GM repeatedly emphasized the Bolt's purported range in its marketing. For example, GM's pressroom released this statement about the launch of the Chevy Bolt:

> Chevrolet promised to offer the first affordable electric vehicle with 200 miles or more of range and will exceed those expectations when the 2017 Bolt EV goes on sale later this year. With the vehicle's EPA-estimated range of 238 miles, owners can expect to go beyond their average daily driving needs — with plenty of range to spare — in the 2017 Bolt EV.

At the time of the 2017 Chevy Bolt's release, GM published a specifications sheet disclosing that the Vehicle was able to maintain a driving range of an estimated 238 miles. The accompanying "product information" fact sheet regarding the 2017 Bolt confirmed that it offered an estimated 238 miles of range. The same was true for the 2018 Chevy Bolt's release, in which GM published the same specifications sheet disclosing the Vehicle's 238-mile battery range, and further reiterated the 238-mile range on its product information fact sheet.

41.     GM further emphasized the range of the Bolt in a number of advertisements, like this ad from The Washington Post in June 2017, which prominently asks consumers to "begin a long-distance relationship, now":

14



42.     GM touted the Chevy Bolt's Battery as being "where it all starts," and advertised an energy capacity of 60 kWh, which GM said allowed drivers to travel an EPA-estimated 238 miles on a single full charge. An example of one such advertisement touting the Bolt's battery capabilities appears below:



GM also displayed the range in a commercial from 2017:

15



43.     One of the Bolt's first three customers stated in a GM press release that it was "the range and technology" that attracted him to the Bolt. After making its initial deliveries of the 2017 Bolt to its very first customers at the end of 2016, GM issued a press release that quoted a California customer who replaced a competing electric car model: "The range and technology attracted me to the Bolt. . . . I look forward to the longer drives I can make compared to the [BMW] i3 that I owned." For the 2018 and 2019 versions of the Bolt, GM continued to tout the Bolt's range prominently in advertisements and press materials that it intended to be disseminated to consumers. Despite GM's representations, the most critical aspect of the Bolt's much- lauded range—the battery—could not be safely charged fully, and the represented range could not be achieved without risking a catastrophic fire.

**C.      The Defective Battery Poses a Significant Safety Risk to Defective Vehicle Owners and Lessees.**

44.     Lithium ion batteries, such as the Defective Battery used in the Bolt, are used in most electric vehicles because of their "high power-to-weight ratio, high energy efficiency, good

high-temperature performance, and low self-discharge." However, these batteries also have a well-documented history of fire issues. Safety concerns related to unexpected fires have been well documented—including a battery fire that happened weeks after the crash test of a Chevy Volt in 2011 and several Tesla Model S vehicles that suddenly caught fire while parked in 2019—and are known to GM. Unfortunately, GM ignored safety concerns in order to market the Vehicle's range, despite warnings published in October 2017 by the National Highway Traffic Safety Administration ("NHTSA") that overcharging lithium-ion batteries can result in one of several exothermic reactions that have the potential to initiate thermal runaway resulting in a spontaneous ignition.

### 1. The Bolt Lithium-Ion Battery Is Defective.

45. Like other batteries, lithium-ion batteries are made up, in pertinent part, of multiple power-generating compartments called "cells." Each cell contains the basic functional components of a battery: a positive electrode, a negative electrode, and an electrolyte.

46. In order to develop a battery that would deliver the advertised range, Defendants developed a battery with "new cell design and chemistry." The battery contains "nickel-rich lithium-ion chemistry" that purportedly provides "improved thermal performance over other chemistries" and requires a "smaller active cooling system for more efficient packaging." According to Defendants, the Bolt uses "active thermal conditioning . . . to keep the battery operating at its optimum temperature, which results in solid battery life performance."

47. The lithium-ion Batteries in the Defective Vehicles were produced at an LG Chem facility in Ochang, South Korea. An image of the Bolt's battery pack is displayed below:



48.    The Bolt's battery is structured with the cells arranged "like books on a bookshelf, in groups." Each group of pouch cells is "stacked to make modules," which are "held together at the ends by long bolts." "The [battery] pack thermal management is regulated by sensing temperature via thermistors located at the ends of the modules" and the liquid coolant is distributed via channels at the base of the cell packs.

49.    GM repeatedly advertised this cell design and chemistry as delivering "a battery system with 160 kilowatts of peak power and 60 kilowatts hours of energy." However, GM was unable to achieve this result without endangering Plaintiffs and other drivers because the thermal management system was inadequate to prevent thermal runaway during charging.

50.    According to NHTSA, proper management of the electrical loads among cells in a pack helps maintain overall charge and discharge performance within an acceptable range. Because temperature is a key indicator of cell electrical performance (e.g., hotter cells may discharge or charge more quickly than colder cells), thermal management strategies must be integrated into the battery system design to monitor charging and discharging events and mitigate potentially problematic conditions that can create a risk of fires like those at issue here.

### 2. GM Knew About the Battery Defect.

51.     After the release of the 2017 Bolt, drivers quickly began to experience issues stemming from the Bolt's lithium-ion battery. Drivers experienced losses of propulsion while driving the Vehicles—including experiencing a sudden inability to accelerate the Vehicle while driving.  Multiple drivers experienced sudden drops in battery levels and loss of power to their Vehicles, some while driving in dangerous conditions.

52.     In December 2016, shortly after launching the Bolt, GM issued Service Bulletin PIC6239 informing dealers of a "Bolt EV (BEV2) High Voltage Battery Exchange and internal Parts Process" that might require dealers to replace the Bolt's "Rechargeable Energy Storage System (RESS)" (i.e., the Battery) or certain related components. This quality improvement program listed steps to determine whether components of the high voltage battery pack needed replacement.

53.     GM addressed the loss of propulsion issue caused by the Defective Battery in a November 2017 customer satisfaction program bulletin:

> Certain 2017 model year Chevrolet Bolt EV vehicles may have a condition  in which the cells within the battery pack have low voltage. This condition is related to the state of charge of the cell group. Eventually, the difference  in the state of charge of the cell groups (average vs. minimum) may exceed a threshold.

GM informed owners that when this condition occurs, the "high voltage battery pack" must be replaced.

54.     By 2019, the issues with the lithium-ion batteries began to escalate when consumers began experiencing vehicle fires when charging their vehicles to a full or near-full charge. On information and belief, the same issue that causes the low-voltage condition in certain cell groups can cause high-voltage conditions in certain cell groups in the Defective Battery. This

issue can cause dangerous overheating of the battery while charging, resulting in fires in the Defective Vehicles. NHTSA has warned that the "affected vehicles' [battery] cell packs have the potential to smoke and ignite internally, which could spread to the rest of the vehicle and cause a structure fire if parked inside a garage or near a house" and that the vehicles "can catch fire even if they are turned off, parked, and disconnected from a charging unit."

55. NHTSA has received numerous reports of fires in Defective Vehicles during or shortly after charging. The first complaint of spontaneous fire from the Defective Vehicles was submitted to NHTSA on July 8, 2019:

> NHTSA ID Number: 11230072
> NHTSA Posting Date: July 8, 2019
>
> ON MARCH 17, 2019 AT APPROXIMATELY 3:45P.M., WE PARKED THE BOLT IN THE DRIVEWAY OF OUR HOME. WE EXITED THE BOLT AND PLUGGED IT INTO OUR JUICEBOX (LEVEL 2) CHARGER AS USUAL. AT APPROXIMATELY 5:00 PM, WE WERE ALERTED THAT THE BOLT WAS ON FIRE. WE DISCOVERED SMOKE BILLOWING OUT OF THE REAR OF THE BOLT AND THE BOLT APPARENTLY COMBUSTING FROM WITHIN IN THE AREA OF THE BATTERY CELLS. THE FIRE DEPARTMENT WAS CONTACTED AND TOOK APPROXIMATELY 3 HOURS TO CONTROL THE FIRE AND SMOKE. THE FIRE DEPARTMENT EVACUATED US, OUR DOWNSTAIRS NEIGHBORS, AND BOTH UNITS OF THE HOME NEXT DOOR DURING THE FIRE. THE FUMES FROM THE BURNING MATERIALS WAS SO THICK AND NOXIOUS IT PERMEATED OUR HOME, REQUIRING PROFESSIONAL CLEANING. WE EXPERIENCED HEADACHES FOLLOWING CONTACT WITH THE SMOKE. THE BOLT IS A TOTAL LOSS. IT TOOK CHEVY A FEW DAYS TO RESPOND TO OUR CLAIM. EVENTUALLY CHEVY SENT TWO ENGINEERS FROM DETROIT TO OUR DRIVEWAY TO INSPECT THE JUICE BOX. **CHEVY PURCHASED THE CAR FROM THE INSURANCE COMPANY**.

56. From July 20, 2020, to August 26, 2020, GM received at least four claims alleging that the Defective Vehicles' battery pack had caused a fire. GM identified more than a dozen battery-related allegations of fire involving 2017–19 Bolt vehicles. GM's internal investigations (spanning from August-November 2020, according to GM) revealed that in at least five of those

cases the fire was related to the battery. In four such cases, the fire occurred when the battery was highly charged just before the fire occurred.

57.     Despite evidence of fires resulting from charging the Bolt's batteries to 100%—and despite GM's apparent purchase of an affected Vehicle for investigative purposes and knowledge of the fires—a GM engineer gave an interview months after the first NHTSA complaints, saying that "[w]e engineered the battery system so that you can charge to 100% and maximize range. If you want maximum range, charge to 100%." GM actually encouraged Chevy Bolt owners and lessees to "top off your battery as much or as little as you like."

58.     As the numerous NHTSA complaints show, and as GM has admitted via its public statements about the recalls, this is untrue. The Defective Battery is at risk of catching fire at full or near full charge unless the Defective Vehicles are modified to deplete full battery capacity, significantly reducing the Vehicle range below the advertised 238-mile range that consumers were promised when they purchased or leased the Defective Vehicles.

**D.     GM issues Ineffective Recalls of the Defective Vehicles.**

**1.     November 2020 Recall.**

59.     On November 13, 2020, more than a year after the first known incident of fire in the Defective Vehicles, and more than four years after GM began manufacturing and distributing the Defective Vehicles, GM issued Recall N202311730.  The recall covered all 2017-2019 Chevy Bolt EVs and warned that the vehicles' high voltage batteries "may pose a risk of fire when charged to full, or very close to full, capacity." Instead of completely recalling the Defective Vehicles to replace the dangerous batteries, GM's recall initially proposed an "interim remedy" for the Defective Vehicles that would limit the battery capacity of the Vehicles to 90% by reprogramming the hybrid propulsion control module:



| GM Recall #: | NHTSA # | Date Issued: |
|---|---|---|
| N202311730 | 20V701 | Nov 13, 2020 |

**Recall Title:**

High Voltage Battery May Melt or Burn

**Recall Description:**

General Motors has decided that a defect which relates to motor vehicle safety exists in select 2017-2019 model year Chevrolet Bolt EV vehicles. A select number of these vehicles were built with high voltage batteries produced at LG Chem's Ochang, Korea facility that may pose a risk of fire when charged to full, or very close to full, capacity. While our investigation into this condition continues, GM has developed software that will limit vehicle charging to 90% of full capacity to mitigate this risk.

**Safety Risk Description:**

If the batteries in select vehicles within this population are charged to full capacity, or very close to full capacity, the batteries may pose a risk of fire.

**Repair Description:**

As an interim remedy, dealers will reprogram the hybrid propulsion control module 2 (HPCM2) to limit full charge to 90%.

**Customer Action:**

For more information, customers can visit www.chevy.com/boltevrecall or contact the Chevrolet EV Concierge 1-833-EVCHEVY or their preferred dealer.

**Recall Status:** INCOMPLETE

GM mailed recall notices to Bolt owners and lessees in November 2020. Below is a copy of a follow-up notice received by consumers:



60.     GM also emailed a notice entitled "Important safety information regarding your Chevrolet Bolt EV" to Bolt owners and lessees in November 2020:




61.     GM notified consumers that dealerships would offer a software update to implement the interim remedy.  GM also instructed consumers how to reduce the Vehicle change settings themselves in order to limit the charging capacity to 90%, leading to a reduction in range

of at least 24 miles. GM also instructed consumers not to park their Vehicles in garages or carports until after they had implemented the software changes:

> We will be providing our dealers with a software update beginning November 17, 2020 that will limit the charge for all the vehicles in this population to 90% while we continue to investigate the cause of these incidents. In the meantime, we know that the safety of our owners and their families is paramount, which is why we're asking owners to take the following steps now that will limit the charge capacity to 90% and reduce the risk of fire.

> If you are unable to successfully make these changes, or do not feel comfortable making these changes, we ask you to not park your car in your garage or carport until after you have visited your dealer.

62. GM's interim remedy not only substantially limited the range of Defective Vehicles, but failed to prevent battery fires. For example, one 2018 Chevy Bolt owner had the interim remedy applied to his Vehicle on March 25, 2021. On May 1, 2021, his Vehicle experienced a battery fire at approximately 11:00 am while his car was parked inside the garage of his home, resulting in an estimated $235,000 worth of damage to his Vehicle and property. The Vehicle was not charging at the time, and prior to the battery fire it was "rarely used" and "[t]he owner did not charge to full often, if ever."

### 2. April 2021 "fix."

63. On April 29, 2021, GM announced a purported permanent "fix" for the Defective Batteries in the Defective Vehicles. GM's remedy consisted of a GM dealer tool to "identify potential battery anomalies and replace battery module assemblies as necessary" coupled with the installation of "advanced onboard diagnostic software into these [Defective] Vehicles that … has

the ability to detect potential issues related to changes in battery module performance before problems can develop":

> General Motors is notifying owners of select 2017-2019 model year Chevrolet Bolt EVs that it has developed a remedy to complete the previously announced safety recall.
>
> As part of the service procedure, dealers will utilize GM-developed diagnostic tools to identify potential battery anomalies and replace battery module assemblies as necessary. The remedy will also include the installation of advanced onboard diagnostic software into these vehicles that, among other things, has the ability to detect potential issues related to changes in battery module performance before problems can develop.
>
> Customers will need to visit their nearest participating Chevrolet Bolt EV dealer to have the remedy service procedure performed. When the vehicle is updated with the new software, the 90% state of charge limitation is removed, so that the battery is returned to its previous maximum charging capacity.

> Customers of 2019 model year Chevrolet Bolt EVs were able to have this remedy performed starting on April 29 and customers who own 2017 and 2018 model year Bolt EVs will be eligible to have the remedy performed starting May 26 at their preferred Chevrolet Bolt EV Dealer. We will also be making the advanced diagnostic software available to all other Bolt EV owners in the coming months. Additionally, we will be making this diagnostic software standard in the 2022 Bolt EV and EUV, as well as future GM electric vehicles.

64.     The new diagnostic software was "supposed to monitor the [battery] cells for voltage variations much more closely and often than before. The idea is to proactively look for the conditions or indications that could lead to a fire. This way they can either avoid them, or get the battery replaced before a fire occurs." If the software detected an abnormality, it advised the operator to take the Vehicle in for a battery swap.

65.     In addition, the software "also monitors the battery after the charge completes to look for abnormalities" and "if the car detects a 'thermal runaway' event (aka impending fire), it will blare the horn and flash the lights." Crucially, like GM's interim November 2020 remedy,

the April recall did not cure the Defective Battery in the Defective Vehicles. Rather, it alerted operators of the Defective Vehicles that a battery fire may still occur or is occurring. The warning did nothing to prevent a runaway event, and in practical terms it was next to worthless as a warning of an impending fire.

66.     Like the interim November 2020 remedy, GM's April purported "fix" did not prevent battery fires. On July 1, 2021, Tim Briglin, a Vermont state legislator and owner of a 2019 Chevy Bolt, experienced a battery fire despite having GM's new diagnostic software installed on June 9, 2021. A photo of the burned vehicle is below:



67.     Prior to receiving the purportedly permanent recall fix, Briglin followed GM's instructions and limited the charge of his Vehicle to 80% capacity and reported no other issues with his Vehicle. At the time he received the recall fix his Vehicle had only 38,264 miles on the odometer. After receiving the recall fix, he resumed charging his battery as instructed by GM.

68.     At least two more Vehicles spontaneously caught fire after receiving the April 2021 "fix." On July 14, 2021, GM released a new recommendation to Plaintiffs: park the Vehicles outside, "away from homes and other structures," immediately after charging, and do not charge

26

the Vehicles overnight. GM recommended this regardless of whether the Vehicle had had the interim or final recall remedy completed.

### 3. July 2021 Recall and Safety Guidance.

69. On July 23, 2021, GM announced Recall N212343880 for all 2017–19 Chevrolet Bolt vehicles, regardless of whether they had already had the previous recall(s) performed. GM announced that it would use software to check for potentially defective batteries and then replace them as needed. Dealers would also install diagnostic software that would allegedly warn of impending fires. In the meantime, GM imposed stringent restrictions on the charging and use of the 2017–19 Defective Vehicles: customers were to limit charging capacity to 90% and avoid depleting their battery below "approximately 70 miles of remaining range," instructions that resulted in a loss of range of more than 40%. GM also instructed owners to "continue to park their vehicles outside immediately after charging and not leave their vehicles charging overnight," inconveniencing their customers and rendering it difficult for them to charge their vehicles.

### 4. August 2021 Recall.

70. On August 17, 2021, GM announced Recall N212345940, which expanded the July 2021 recall to include roughly 9,000 previously excluded 2019 model year Defective Vehicles plus more than sixty-thousand 2020–22 model year Defective Vehicles. Once again, GM asked customers to limit charging capacity to 90%, to avoid depleting their battery below "approximately 70 miles of remaining range and to "continue to park their vehicles outside immediately after charging and not leave their vehicles charging overnight:"

| Condition | General Motors has decided that a defect which relates to motor vehicle safety exists in 2020-22 model year Chevrolet Bolt EV and 2022 model year Chevrolet Bolt EUV vehicles. The high voltage batteries in some vehicles may pose a risk of fire when charged to full, or very close to full, capacity. |
|---|---|
| Correction | The remedy will be the replacement of defective battery modules in the recall population. Until the updated recall remedy is performed, customers should take the following interim steps: |
| | 1.  Customers should set their vehicle's high-voltage battery system to a 90% state of charge limitation using Target Charge Level mode. If customers are unable to successfully make these changes, or do not feel comfortable making these changes, customers should visit their dealer to have these adjustments completed. |
| | 2.  Additionally, we ask that customers charge their vehicle more frequently and avoid depleting their battery below approximately 70 miles (113 KM) of remaining range, where possible. |
| | 3.  Out of an abundance of caution, customers should continue to park their vehicles outside immediately after charging and not leave their vehicles charging indoors overnight. |

GM admitted that it did not have a fix for the Vehicles at the time, stating that "we are working on a process to identify which modules are defect-free and which need to be replaced. Once we have a validated process, we will be able to replace only those modules that are actually defective."

71.  GM mailed notices of the updated recall to owners and lessees of the Vehicles in August 2021 such as the following:

This notice is sent to you in accordance with the National Traffic and Motor Vehicle Safety Act.

General Motors has decided that a defect which relates to motor vehicle safety exists in certain 2017 model year Chevrolet Bolt EV vehicles. As a result, GM is conducting a safety recall. We apologize for this inconvenience. However, we are concerned about your safety and continued satisfaction with our products.

---

**IMPORTANT**

- Your vehicle is involved in a new GM safety recall N212343880.
- Previously, you were notified that your vehicle is involved in GM recall N202311731. If you have not done so, you should visit your Chevrolet EV dealer to obtain the remedy for the previous recall, which includes an important software update and diagnostic check on the health of your vehicle's battery system.
- This letter contains important interim safety precautions that should be followed until the final recall remedy for new recall number N212343880 is performed on your vehicle.

---

| **Why is your vehicle being recalled?** | Certain vehicles were built with high voltage cells produced at LG Chem's Ochang, Korea facility that pose a risk of fire when charged to full, or very close to full, capacity. Experts from GM and LG have identified the simultaneous presence of two manufacturing defects in the same battery cell as the root cause of these battery fires. |
|---|---|
| **What will we do?** | **Parts to repair your vehicle are not currently available,** but when parts are available, your Chevrolet dealer will replace the lithium ion battery modules in your vehicle with new lithium ion battery modules. This service will be performed for you at **no charge.** |
| | We are working as quickly as possible to correct this condition. When parts are available, we will send you another letter asking you to take your vehicle to your Chevrolet dealer to have your vehicle serviced. You can also check the status of this recall at: https://my.gm.com/recalls. |

**What should you do?**

While we prepare to conduct this recall, you should take the following interim steps:

1. You should, whether or not your vehicle received the recall remedy in GM safety recall N202311731, return your vehicle to the 90% state of charge limitation using Hilltop Reserve mode (for 2017-2018 model years) or Target Charge Level (for 2019 model year) mode. If you are unable to successfully make these changes, or do not feel comfortable making these changes, visit your Chevrolet EV dealer to have these adjustments completed, **free of charge.**

2. Charge your vehicle more frequently and avoid depleting your battery below approximately 70 miles (113 KM) of remaining range, where possible.

3. **Continue to park your vehicle outside immediately after charging and do not leave your vehicle charging indoors overnight.**

If you have not visited your dealer to receive the recall remedy in GM safety recall N202311731, you should visit your Chevrolet EV dealer to obtain this important software update, which includes a diagnostic check on the health of your vehicle's battery system. After obtaining the software update, you should still take the interim steps summarized above. When scheduling your appointment, confirm with the dealer that they are an EV certified dealer.

**Do you have questions?**

If you have questions or concerns that your dealer is unable to resolve, please contact the Chevrolet EV Concierge team at 833-EVCHEVY (833-382-4389). Hours of operation are Monday through Friday, 8:00 AM to 12:00 AM ET or Saturday and Sunday, 12:00 PM to 9:00 PM ET.

If after contacting your dealer and the Chevrolet EV Concierge, you are still not satisfied we have done our best to remedy this condition without charge and within a reasonable time, you may wish to write the Administrator, National Highway Traffic Safety Administration, 1200 New Jersey Avenue, SE., Washington, DC 20590, or call the toll-free Vehicle Safety Hotline at 1.888.327.4236 (TTY 1.800.424.9153), or go to http://www.safercar.gov. The National Highway Traffic Safety Administration Campaign ID Number for this recall is 21V560.

Federal regulation requires that any vehicle lessor receiving this recall notice must forward a copy of this notice to the lessee within ten days.

*Regina A. Carto*

Regina A. Carto
Vice President
Global Product Safety and Systems

72.     In September 2021, GM announced further restrictions on owners and lessees of the Vehicles. In addition to the recall instructions, if owners or lessees needed to park in a parking lot or structure, GM now recommended "parking on the top floor or on an open-air deck and park[ing] 50 feet or more away from [other] vehicle[s]." GM repeated this advice to consumers on multiple forums.

73.     In October 2021, GM issued Recall N212343881 covering all 2017-2019 Chevy Bolt EVs.

## Product Safety Recall
### N212343881 High Voltage Battery May Melt or Burn



| Make | Model | Model Year | | RPO | Description |
| | | From | To | | |
| --- | --- | --- | --- | --- | --- |
| Chevrolet | Bolt EV | 2017 | 2019 | | |

Involved vehicles are marked "Open" on the Investigate Vehicle History screen in GM Global Warranty Management system. This site should always be checked to confirm vehicle involvement prior to beginning any required inspections and/or repairs.

| Condition | General Motors has decided that a defect which relates to motor vehicle safety exists in certain 2017-2019 model year Chevrolet Bolt EV vehicles. The high voltage batteries in these vehicles may pose a risk of fire when charged to full, or very close to full, capacity. |
| --- | --- |
| Correction | Dealers will replace the lithium-ion battery pack in the vehicle. |

Pursuant to the Recall, GM dealers would "replace the lithium-ion battery pack" in the affected vehicles. That same month, GM announced Recall N212345941, which expanded the battery replacement recall to all 2020-2022 Chevy Bolt EVs and 2022 Chevy Bolt EUVs.

74.     Then, in December 2021, GM announced Recall N212345940-01, a revision to Recall N212345940. The recall applied to all 2020-2022 Chevy Bolt EVs and 2022 Chevy Bolt EUVs. The recall claimed that GM had developed new diagnostic software that would limit the vehicle's maximum charge to 80% and would remove some of the prior charging and use limitations. Even if true, the new recall would lead to a decrease in range of more than 20%.

75.     Finally, in June 2023, GM issued Recall N212345944 and Recall N212345945. The recalls applied to most 2020-2022 Chevy Bolt EVs and 2022 Bolt EUVs. The recall informed Bolt owners that GM would install advanced diagnostic software that would limit the Defective Batteries to a maximum state of charge of 80%. If no anomalies were detected by the software after 6200 miles of use, the battery would return to 100%. If problems were the detected, battery would be replaced:

| Condition | General Motors has decided that a defect which relates to motor vehicle safety exists in certain 2020-2022 model year Chevrolet Bolt EV, and 2022 model year Chevrolet Bolt EUV vehicles. The high voltage batteries in these vehicles may pose a risk of fire when charged to full, or very close to full, capacity. |
|---|---|
| Correction | Dealers are to install the advanced diagnostic software that will monitor battery performance and identify defective battery modules that require replacement. |

GM issued a Notice to Consumers that explained the terms of the recall:

**Safety Recall**
N212345945 High Voltage Battery May Melt or Burn (GM Owned Vehicles)



 **NOTICE TO CUSTOMER**

This vehicle is now updated with a new advanced diagnostic software that will continually monitor the high voltage battery. If the software detects a problem in your vehicle's high voltage battery, you will be alerted via a warning in the driver information center. If this occurs, you should contact your Chevrolet Bolt EV/EUV certified dealer to have the affected high voltage battery module replaced.

The software will initially limit your vehicle's high voltage battery to a maximum state-of-charge of 80%. If no anomalies are detected after **approximately** 6,200 miles or 10,000 km of use, the high voltage battery will automatically return to a maximum state-of-charge of 100% without a return trip to the dealer. After this occurs, the software's advanced diagnostics will continue to monitor your vehicle's high voltage battery system.

76.     As part of the June 2023 recall, GM also informed owners that until they received the new software or a new battery, they should continue to limit charging to 90%, not allow the battery range to get below 70 miles, park their vehicle outside after charging and not charge their vehicles indoors overnight:

If you have not been able to visit your local dealer for a software update or lithium-ion battery module replacement, we ask that you continue to follow these steps:

1. Set your vehicle to a 90 percent state of charge limitation using Hilltop Reserve mode (for 2017-2018 model years) or Target Charge Level mode (for 2019-2022 model years). Instructions on how to do this are available in the videos below. If you are unable to successfully make these changes, or do not feel comfortable making these changes, please visit your Chevrolet dealer to have these adjustments completed.

2. Charge your vehicle more frequently and avoid depleting your vehicle battery to below approximately 70 miles (113 kilometers) of remaining range, where possible.

3. Park your vehicle outside immediately after charging and do not leave your vehicle charging indoors overnight.

77. Despite GM's multiple recalls, Plaintiffs are now left with vehicles that cannot reach the advertised range, that they cannot charge at convenient times or locations, and that may spontaneously burst into flames, causing serious harm to the vehicle and its owners, lessees and occupants. Plaintiffs were also deprived of the benefit of their bargain in purchasing or leasing their Defective Vehicles.

78. Defendants have been unable to develop, implement, and deliver a repair that relieves consumers from their current unsafe and unacceptable circumstances. Even if they could do so tomorrow, Plaintiffs would still have suffered economic harm. Had Defendants disclosed the Vehicles' true characteristics, consumers would have paid much less for the Vehicles, if they would have bought or leased them at all. This means that Plaintiffs overpaid for the Defective Vehicles at the time of purchase. Consumers who drove their Vehicles less frequently because of range anxiety, range limitations, inconvenient charging, or other reasons related to the defects

also lost the benefits of use and the option for use, while their Vehicles still depreciated as they aged.

79.     Lower performance, inferior performance capability, such as range limits, safety hazards, mitigation costs, and reduced value are all attributable to the defect and diminish the value of Plaintiffs' ownership experience, for reasons attributable to the unreasonable and undisclosed Battery Defects. As a result, Plaintiffs have suffered economic harm. Even a full and complete repair today, were one possible, would only terminate some of those injuries. It would not remedy harm that Plaintiffs have already suffered and will suffer in the future.

## CAUSES OF ACTION

### First Cause of Action: Breach of Express Warranty (810 ILCS 5/2-313)

80.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

81.     The subject vehicles constitute "goods" under the Uniform Commercial Code, Sections 2-105(1) and 2A-103(h), and under 810 ILCS 5/2-105.

82.     Plaintiffs' purchase or lease of the subject vehicles was accompanied by express warranties as defined in UCC Sections 2-313 and/or 2A-210, as well as 810 ILCS 5/2-313, written and otherwise offered by Defendant, whereby said warranties were part of the basis of the bargain of upon which Plaintiffs relied.  Specifically, Defendants provided all purchasers and lessees of the Defective Vehicles with an express written warranty that covered the Vehicles, including but not limited to the battery, and Defendants warranted the Vehicle to be free of defects in materials and workmanship at the time of purchase or lease.  Defendants also warranted that the Defective Vehicles' high voltage battery pack was free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized dealers, without

charge, to correct defects in materials or workmanship which occurred during the first 8 years or 100,000 miles, whichever came first. These express warranties became part of the basis of the parties' bargain. Accordingly, Defendants' warranties are express warranties under the UCC.

83. The vehicles were not as warranted and represented in that the vehicles have the transmission defects or conditions described above, as well as defects or conditions as reflected in the various repair orders, technical service bulletins, special service messages, recall documents and consumer complaints in possession of Defendant.

84. As a result of their many defects, the subject vehicle cannot be reasonably relied on by Plaintiffs for the ordinary purpose of safe, reliable and efficient transportation.

85. Plaintiffs have provided the Defendants with sufficient opportunities to repair or replace the subject vehicles. Plaintiffs have reasonably met all obligations and pre-conditions as provided in the express warranty.

86. Defendant has breached the express warranties by failing to adequately repair the subject vehicles and/or have not repaired the subject vehicles in a timely fashion, and the vehicles remain in a defective condition. Defendants sold and leased the Defective Vehicles with the Defective Batteries, requiring repair or replacement within the applicable warranty periods, and refused to honor the warranties by providing free repairs or replacements during the applicable warranty periods sufficient for the Defective Vehicles to be restored to their advertised qualities within a reasonable time.

87. The subject vehicles continue to contain defects that substantially impair the use, safety and value of the vehicles. These defects and non-conformities could not reasonably have been discovered by Plaintiffs prior to Plaintiffs' acceptance of the subject vehicle.

88.     As a result of Defendant's breaches of express warranties, Plaintiffs have suffered damages within the jurisdictional limits of this Court in the form of overpayment at the time of purchase, out of pocket repair costs and diminution in value of the subject vehicles. Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

89.     Plaintiffs each notified Defendants of their breach within a reasonable time, and/or were not required to do so because affording Defendants a reasonable opportunity to cure their breaches would have been futile. *See, e.g., In re Chevrolet Bolt EV Battery Litig.*, 633 F. Supp. 3d 921, 976 (E.D. Mich. 2022) ("The Court is persuaded that Plaintiffs have alleged enough to establish that it would have been futile to present their vehicles for repair. Plaintiffs have made the sort of representations the Gregorio court suggested would be sufficient: that there is a defect common to all class vehicles; that GM was consistently unable to fix the defect; and that any repairs or mitigation that GM offered were insufficient.").

90.     In any event, Defendants know about the defect but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, Defendants were provided notice of these issues within a reasonable amount of time by the numerous complaints they received from various sources, including through the NHTSA database, other online sources, and directly from consumers, including Plaintiffs.

91.     Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, any warranty limitations are unenforceable because Defendants knowingly sold a defective product to Plaintiffs. The time limits contained in the applicable warranty period were also unconscionable and inadequate to protect Plaintiffs. Among other things, Plaintiffs had no meaningful choice in

determining these time limitations, the terms of which unreasonably favored Defendants. A gross disparity in bargaining power existed between Defendants and the Plaintiffs because Defendants knew or should have known that the Defective Vehicles were defective at the time of sale and would fail well before their useful lives.

92. Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect failed its essential purpose because the contractual remedy is insufficient to make Plaintiffs whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

93. Plaintiffs provided Defendant with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches.

## Second Cause of Action: Breach of Implied Warranty (810 ILCS 5/2-314)

94. Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

95. Defendant is a "merchant" with respect to motor vehicles under the Uniform Commercial Code Section 2-104( 1) and a "seller" as defined by 810 ILCS 5/2-103.

96. The subject vehicles constitute "goods" under the Uniform Commercial Code, Sections 2-105(1) and 2A-103(h), and under 810 ILCS 5/2-105.

97. The subject vehicles were subject to implied warranties of merchantability under UCC Sections 2-314 and/or Section 2A-212 as well as 810 ILCS 5/2-314.

98. Defendant provided Plaintiffs with an implied warranty that the Defective Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. Defendant impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the vehicles

were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Defective Vehicles would be fit for their intended use while being operated.

99. The Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Defective Battery can manifest and result in spontaneous ignition and fire when fully or nearly fully charged and are therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of Defective Vehicles severely compromised their range and the ease of charging the vehicles.

100. Plaintiffs provided Defendant with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches. Plaintiffs each notified Defendants of their breach within a reasonable time, and/or were not required to do so because affording Defendants a reasonable opportunity to cure their breaches would have been futile. *See, e.g., In re Chevrolet Bolt EV Battery Litig*., 633 F. Supp. 3d 921, 976 (E.D. Mich. 2022) ("The Court is persuaded that Plaintiffs have alleged enough to establish that it would have been futile to present their vehicles for repair. Plaintiffs have made the sort of representations the Gregorio court suggested would be sufficient: that there is a defect common to all class vehicles; that GM was consistently unable to fix the defect; and that any repairs or mitigation that GM offered were insufficient.").

101. In any event, Defendants know about the defect but instead chose to conceal it until just recently as a means of avoiding compliance with its warranty obligations. Moreover, Defendants were provided notice of these issues within a reasonable amount of time by the

numerous complaints they received from various sources, including through the NHTSA database, other online sources, and directly from consumers, including Plaintiffs.

102.     Defendant failed to adequately remedy the transmission defects in the subject vehicles within a reasonable time, and the vehicles continue to be in unmerchantable condition at the time of filing this Complaint.

103.     Plaintiffs purchased their vehicles from a network of authorized GM dealers, were the intended consumers of the Defective Vehicles and the dealers had no rights under the warranty agreements.  As such, GM is liable for the breach of the implied warranty of merchantability despite an alleged lack of privity with Plaintiffs.  *See, e.g., In re Chevrolet Bolt EV Battery Litig.*, 633 F. Supp. 3d 921, 976 (E.D. Mich. 2022) (recognizing "a third-party beneficiary exception to the privity requirement").

104.     Plaintiffs are entitled to relief under the UCC because Defendants' breach of the implied warranty of merchantability was a producing cause of economic damages to Plaintiffs in the form of overpayment at the time of purchase, out of pocket repair costs and diminution in value of the subject vehicles.  Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

### Third Cause of Action: Breach of Express Warranty-Magnuson Moss Warranty Act

105.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

106.     Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). GM is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5). The Defective Vehicles, including Plaintiffs' Vehicles, are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

107.     Plaintiffs' purchase or lease of the subject vehicles was accompanied by express warranties as defined in 15 U.S.C. § 2301(6). Specifically, Defendants provided all purchasers and lessees of the Defective Vehicles with an express written warranty that covered the Vehicles, including but not limited to the battery, and Defendants warranted the Vehicle to be free of defects in materials and workmanship at the time of purchase or lease. Defendants also warranted that the Defective Vehicles' high voltage battery pack was free of defects in design, materials, and workmanship and that repairs and other adjustments would be made by authorized dealers, without charge, to correct defects in materials or workmanship which occurred during the first 8 years or 100,000 miles, whichever came first.

108.     The vehicles were not as warranted and represented in that the vehicles have the transmission defects or conditions described above, as well as defects or conditions as reflected in the various repair orders, technical service bulletins, special service messages, recall documents and consumer complaints in possession of Defendant.

109.     As a result of their many defects, the subject vehicle cannot be reasonably relied on by Plaintiffs for the ordinary purpose of safe, reliable and efficient transportation.

110.     Plaintiffs have provided the Defendants with sufficient opportunities to repair or replace the subject vehicles. Plaintiffs have reasonably met all obligations and pre-conditions as provided in the express warranty. Plaintiffs provided Defendant with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches.

111.     Defendant has breached the express warranties by failing to adequately repair the subject vehicles and/or have not repaired the subject vehicles in a timely fashion, and the vehicles remain in a defective condition. Defendants sold and leased the Defective Vehicles with the Defective Batteries, requiring repair or replacement within the applicable warranty periods, and

refused to honor the warranties by providing free repairs or replacements during the applicable warranty periods sufficient for the Defective Vehicles to be restored to their advertised qualities within a reasonable time.

112.    The subject vehicles continue to contain defects that substantially impair the use, safety and value of the vehicles.  These defects and non-conformities could not reasonably have been discovered by Plaintiffs prior to Plaintiffs' acceptance of the subject vehicle.

113.    As a result of Defendant's breaches of express warranties, Plaintiffs have suffered damages within the jurisdictional limits of this Court in the form of overpayment at the time of purchase, out of pocket repair costs and diminution in value of the subject vehicles.  Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

114.    Any attempt to disclaim or limit these express warranties vis-à-vis consumers is unconscionable and unenforceable under the circumstances here. Specifically, any warranty limitations are unenforceable because Defendants knowingly sold a defective product to Plaintiffs. The time limits contained in the applicable warranty period were also unconscionable and inadequate to protect Plaintiffs. Among other things, Plaintiffs had no meaningful choice in determining these time limitations, the terms of which unreasonably favored Defendants.  A gross disparity in bargaining power existed between Defendants and the Plaintiffs because Defendants knew or should have known that the Defective Vehicles were defective at the time of sale and would fail well before their useful lives.

115.    Furthermore, the limited warranty promising to repair and/or correct a manufacturing defect failed its essential purpose because the contractual remedy is insufficient to

make Plaintiffs whole and because Defendants have failed and/or have refused to adequately provide the promised remedies within a reasonable time.

**Fourth Cause of Action: Breach of Implied Warranty-Magnuson Moss Warranty Act**

116.     Plaintiffs incorporate by reference each preceding paragraph as though fully set forth herein.

117.     Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). GM is a supplier and warrantor within the meaning of 15 U.S.C. §§ 2301(4)-(5). The Defective Vehicles, including Plaintiffs' Vehicles, are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

118.     Defendant provided Plaintiffs with an implied warranty under 15 U.S.C. § 2301(7) that the Defective Vehicles, and any parts thereof, are merchantable and fit for the ordinary purposes for which they were sold. Defendant impliedly warranted that the Defective Vehicles were of merchantable quality and fit for such use. This implied warranty included, among other things: (i) a warranty that the vehicles were safe and reliable for providing transportation, and would not experience premature and catastrophic failure; and (ii) a warranty that the Defective Vehicles would be fit for their intended use while being operated.

119.     The Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and safe transportation at the time of sale or thereafter because the Defective Battery can manifest and result in spontaneous ignition and fire when fully or nearly fully charged and are therefore not safe to operate. In addition, the Defective Vehicles were and are not fit for their ordinary purpose of providing reasonably reliable and convenient transportation at the time of sale or thereafter because the restrictions placed on the use and charging of Defective Vehicles severely compromised their range and the ease of charging the vehicles.

41

120.    Plaintiffs provided Defendant with notice of its breaches of warranty within a reasonable time after they discovered or should have discovered such breaches.

121.    Defendant failed to adequately remedy the transmission defects in the subject vehicles within a reasonable time, and the vehicles continue to be in unmerchantable condition at the time of filing this Complaint.

122.    Plaintiffs are entitled to relief because Defendants' breach of the implied warranty of merchantability was a producing cause of economic damages to Plaintiffs in the form of overpayment at the time of purchase, out of pocket repair costs and diminution in value of the subject vehicles.  Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

**Fifth Cause of Action: Violations of the Illinois
Consumer Fraud and Deceptive Practices Act (815 ILCS 505/2)**

123.    Plaintiffs incorporate by reference herein the foregoing paragraphs.

124.    The Defective Vehicles, including Plaintiffs' Vehicles, are "merchandise" as defined by 815 Ill. Comp. Stat. § 505/1(b).

125.    Defendant is a "person" as defined by 815 Ill. Comp. Stat. § 505/1(c).

126.    Plaintiffs are "consumers" as defined by 815 Ill. Comp. Stat. § 505/1(e).

127.    Illinois' Consumer Fraud and Deceptive Business Practices Act (the "Act") prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce, including "the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . whether any person has in fact been misled, deceived or damaged thereby."  815 Ill. Comp. Stat. § 505/2.

128. GM engaged in false, misleading and deceptive acts and practices by representing that the Subject Vehicles had a 200-mile electric range, which they did not have unless charged to an unsafe and dangerous level which could lead to a fire. GM further in false, misleading and deceptive acts and practices by failing to inform Plaintiffs and others of the Subject Vehicles' serious battery defect. GM was aware of the battery defect at the time it marketed and sold the Subject Vehicles to Plaintiffs and failed to disclose this material fact to Plaintiffs.

129. GM intended that Plaintiffs rely on GM's false, misleading and deceptive acts and practices in purchasing the Subject Vehicles. Had Plaintiffs been aware of the true facts, they would not have purchased the Subject Vehicles or would have paid substantially less for them. By purchasing the Subject Vehicles at the prices they paid, Plaintiffs suffered actual damages as a result of GM's false, misleading and deceptive acts and practices, including but not limited to overpayment at the time of purchase, out of pocket repair costs and diminution in value of the subject vehicles. Plaintiffs seek an award of such damages along with all reasonable and necessary attorneys' fees and costs of court.

## **ATTORNEYS' FEES**

130. Plaintiffs seek all reasonable and necessary attorneys' fees in this case, which include the following:

a. preparation and trial of this lawsuit;

b. post-trial, pre-appeal legal services; and

c. an appeal to the Seventh Circuit Court of Appeals.

## **CONDITIONS PRECEDENT**

131. All notices and other conditions precedent to Plaintiffs' right to recover herein have been performed or have occurred.

## JURY DEMAND

132.    Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs request a jury trial of this matter and tender the proper jury fee with the filing of this petition.

## CONCLUSION AND PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs respectfully pray that Defendants be cited to appear and answer herein, and that upon final trial, they recover their actual damages, additional statutory damages, exemplary damages, attorney's fees, costs of court, pre-judgment and post-judgment interest at the highest legal rates, and such other and further relief, both general and special, at law or in equity, to which they may be justly entitled.

Respectfully submitted,

*/s/ Eric D. Pearson*
Eric D. Pearson
Illinois State Bar No. 6315124
Charles L. Miller
Texas State Bar No. 24007677
eric@hop-law.com
**HEYGOOD, ORR & PEARSON**
6363 N. State Hwy 161, Ste. 450
Irving, TX 75038
(214) 237-9001
(214) 237-9001 (facsimile)

**ATTORNEYS FOR PLAINTIFFS**